UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 16-11425-GAO

PATRICIA CAHILL,
Plaintiff,

v.

ROBERT L. WILKIE, Secretary of the U.S. Department of Veterans Affairs,[1]
Defendant.

OPINION AND ORDER
September 27, 2019

O'TOOLE, D.J.

This is an employment discrimination lawsuit filed by the plaintiff, Patricia Cahill, against her former employer, the United States Department of Veterans Affairs ("VA"). The amended complaint brings claims under Title VII of the Civil Rights Act of 1964 (Counts I, IV, and V) and the Rehabilitation Act of 1973 (Counts II and III). The defendant has moved for summary judgment in its favor on all claims.

## I.  Factual Background

Cahill, a registered nurse, started working at the VA in 1994. In 2000, she sustained injuries unrelated to this litigation and was out of work for approximately ten years. In 2011, she returned to the VA working as a Revenue Utilization Review Nurse.

In early 2012, she suffered a brain injury that resulted in ongoing cognitive issues, including an inability to multi-task or concentrate. As a result of these injuries, she reported to the VA's Reasonable Accommodation Committee ("RAC") in March 2012 that she was unable to

---

[1] The new Secretary of the Department of Veterans Affairs, Robert L. Wilkie, was automatically substituted as a party pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

perform the functions of her position. At all times relevant here, her main point of contact to the RAC was VA Human Resources Officer James Tavares.

In August 2012, Cahill accepted an accommodation in the form of a temporary detail assignment in the Home Telehealth Department at the VA's Brockton campus. Throughout the course of her detail, she frequently worked in a shared office with co-workers Johnny Stewart and Marilyn Murguia.

On November 19, 2013, Cahill and Stewart had a disagreement of some sort which Cahill described to her supervisor, Eileen Tarsky, through the VA instant messaging ("IM") system minutes after it occurred:

> MM [Marilyn Murguia] & I were working quietly...both on phone w/pts...Johnny [Stewart] walks in MM off phone, asks MM for cigarette and talking LOUDLY, I asked to lower voice as on phone w/pt...I couldn't hear the pt...when I hung up he started yelling at me to get my own office and that I "needed help". He then took off and slammed the door...I'm terrified of him...he's always telling me what to do!

(Second Weida Decl., Ex. H (dkt. no. 99-8).)

According to Murguia, who witnessed the event:

Patricia was on the phone and at the same time Johnny asked me a question in a normal tone of voice. At this point Patricia became agitated and made an exaggerated physical [gesture] about the noise. Johnny then got up and headed toward my desk to continue the conversations while lowering his voice. Following this Patricia and Johnny had a short verbal dispute, with Johnny leaving the room. There was no yelling or physical contact during this time. Shortly after Johnny returned to work and all was quiet until the end of the work day.

(First Weida Decl., Ex. F (dkt. no. 97-6).)

After speaking to various individuals about the incident, Tarsky and the other managers agreed to assign Cahill permanently to the shared office, and to relocate Stewart to another office on a different floor. Tarksy also drafted an incident report, describing both the incident and the corrective action that was taken. The VA's Safety Manager and Chief of Police both reviewed the

2

report and concluded that no further action was necessary. Cahill maintains in this litigation that she was assaulted during the incident and that she and Stewart were never effectively separated.

A week later, on November 26, Cahill received a duty status report containing an evaluation from Dr. Tammy Harris at the VA's Occupational Health Services. The report diagnosed Cahill with situational anxiety and found her unfit for duty pending a follow-up evaluation in early January 2014. The report also included as a workplace restriction that Cahill was not to be exposed to hostile co-workers. Cahill then ceased to attend work until August 2014.

On February 6 and 28, 2014, Tavares and then Tarsky each sent a letter to Cahill instructing her to return to work. In April, Tavares suggested that Cahill could return to the Patient Call Center in Jamaica Plain, where she had worked on an interim basis in 2012. Cahill rejected the idea and stated that she wanted to return to the Home Telehealth Department in Brockton.

On May 1, Cahill initiated contact with an EEO counselor about the November 19, 2013 incident, claiming race and disability discrimination, naming Tavares and Tarsky as responsible parties.

A. Home Telehealth *Redux*

In August 2014, Cahill accepted an accommodation in the form of a permanent position as a Registered Nurse at the Home Telehealth Department in Brockton. She started on August 25, working again under Tarsky's supervision. In September, Cahill had several absences from work and worked from home without permission. In November, a nurse reported to Tarsky that Cahill could not perform her job independently, and that Cahill had committed two violations of VA policy by failing to safeguard patient medical information and by leaving a threatening voicemail

on another nurse's phone.[2] In early December, a different nurse reported to Tarsky and HR that she was receiving complaints from patients about Cahill's poor performance. On December 18, Cahill requested, and subsequently received, an accommodation in the form of a transfer to the Patient Call Center in Jamaica Plain.

    B.       Patient Call Center Jamaica Plain

On or about January 18, 2015, Cahill started working at the Patient Call Center in Jamaica Plain and again fell short of expectations. Her supervisor at the Patient Call Center, Kathleen Craig, memorialized Cahills poor performance in an email to another supervisor and HR, which stated "I do not feel that Patricia could focus enough on calls to appropriately triage patient sick calls. I am extremely worried this is a patient safety issue as well." (See First Weida Decl., Ex. BB dkt. no. 97-28).)

In March and June 2015, Cahill requested an accommodation in the form of fulltime telework privileges. Craig, her supervisor, informed the RAC that fulltime telework would be acceptable provided that Cahill first complete a 90-day, face-to-face orientation. On July 31, Cahill was offered and accepted the accommodation, including the orientation condition.

On August 10, Cahill started her orientation at the Patient Call Center, but three months later, when the orientation was supposed to be done, she had completed only about 4 weeks' worth of orientation. The RAC subsequently sent Cahill two additional letters offering to consider additional accommodations should she so request. Cahill never responded.

---

[2] Cahill would subsequently leave another threatening voicemail on the nurse's phone in January 2015. On February 13, 2015, for the above conduct—failure to safeguard patient medical information, absent without leave ("AWOL"), and the threatening voice messages—Cahill was issued a proposed suspension of 14 calendar days. On July 30, 2015, the charges of failing to safeguard confidential matter and conduct unbecoming a federal employee were sustained, but the AWOL charge was not sustained. The suspension was reduced from 14-calendar days to 7-calendar days.

4

C.  Disability Retirement Application

On January 4, 2016, Cahill applied to the Office of Personnel Management ("OPM") for disability retirement under the Federal Employees Retirement System ("FERS"). Cahill signed the application certifying that the statements were true and acknowledging that false statements could be punished.

Cahill's OPM attorney, Thomas P. Fochs, submitted an addendum to that disability retirement application. In a section describing how Cahill's medical conditions interfered with her ability to perform the essential functions of her job, the addendum stated, among other things,

> Patricia's hearing problems (hearing loss and Hyeracusis) interfere with her ability to work on a phone, work in an office with other people who are also working on a phone or to hear clearly when interacting with other people, as required by her assigned job duties.

(First Weida Decl., Ex. JJ (dkt. no. 97-36).)

On February 3, 2018, a physician reviewing Cahill's disability retirement application, Dr. David R. Carnow, issued a written report finding that Cahill could not perform the essential functions of her job; specifically, that her hearing loss as of February 17, 2015, prevented her from communicating by telephone.

On February 7, 2018, OPM informed Cahill by letter that her disability retirement application had been approved. The letter stated, in relevant part, "[i]n reviewing your medical records, we have found you to be disabled for your position as a RN Telephone Care due to hearing loss." (First Weida Decl., Ex. LL (dkt. no. 97-38).)

**II.    Discussion**

"Summary judgment is appropriate where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

5

of law.'" Audette v. Town of Plymouth, MA, 858 F.3d 13, 19 (1st Cir. 2017) (quoting Mulloy v. Acushnet Co., 460 F.3d 141, 145 (1st Cir. 2006)). Although the record is construed in the light most favorable to the non-moving party, the Court need not consider "conclusory allegations, improbable inferences, [or] unsupported speculation." Mulloy, 460 F.3d at 145.

A. Administrative Remedies (Counts I and II)

Counts I and II allege that the VA failed to take appropriate action in response to the office incident involving Johnny Stewart on November 19, 2013. It is undisputed that Cahill did not contact an EEO counselor within forty-five days of the incident as to either claim. The timely reporting of such a claim is a prerequisite to adjudication of the claim. Ayala v. Shinseki, 780 F.3d 52, 56 n.6 (1st Cir. 2015) (quoting 29 C.F.R. § 1614.105(a)(1)). See also Velázquez–Rivera v. Danzig, 234 F.3d 790, 794 (1st Cir. 2000) ("[A] federal employee's failure to contact an EEOC counselor within the limitations period causes him to lose his right to pursue a later de novo action in court." (citing Román–Martínez v. Runyon, 100 F.3d 213, 216–18 (1st Cir.1996))).

Cahill argues that her May 1, 2014 contact with the EEO counselor was timely under the "continuing violations doctrine." It is not necessary to decide whether that doctrine is appropriate because even if it was, her claims would still be untimely. Upon receiving the letter from Tavares in February 2014, Cahill "should have known that she had been subjected to adverse employment actions". See Ayala, 780 F.3d at 58.

B. Failure to Provide Reasonable Accommodation (Count III)

Count III alleges, first, that the five-month delay in approving Cahill's March 5, 2015 request for full-time telework constituted a reasonable accommodation denial, and second, that the VA should have provided her with an accommodation to the on-site orientation. The defendant

6

contends that Cahill cannot establish that she was a qualified individual in 2015 because of the sworn statements in, and subsequent approval of, her FERS disability benefits application.

A plaintiff claiming failure to accommodate under the Rehabilitation Act must establish by a preponderance of the evidence that: (1) she was disabled within the meaning of the statute; (2) she was qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and (3) the employer did not acquiesce to the reasonable accommodation request despite knowing of the disability. Rios-Jimenez v. Principi, 520 F.3d 31, 41 (1st Cir. 2008).

When "faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements." Pena v. Honeywell Int'l, Inc., 923 F.3d 18, 28 (1st Cir. 2019) (quoting Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 807 (1999)). "To defeat summary judgment, the plaintiff's 'explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" Id. (quoting Cleveland, 526 U.S. at 807).

Cahill argues that the statements in her benefits application could be construed in various ways to be consistent with teleworking. These are essentially the same sort of non-evidentiary explanations that the First Circuit rejected in Pena. See id. ("This misreads (and would read out of the law) Cleveland's reasoned explanation requirement."). She otherwise produces no evidence that would raise a triable dispute that could be sufficient to overcome her own contrary sworn statements, the conclusion of the OPM physician, the defendant's medical expert, and her problematic work history.

C.  Retaliatory Hostile Work Environment (Count IV)

Cahill alleges that Tavares and Tarsky both retaliated for her having filed the EEO complaint in May 2014.[3] Specifically, she claims that Tavares delayed finding her an accommodation so that she would be forced to take unpaid leave, and that Tarksy created a hostile work environment when Cahill returned to work in August 2014 by reprimanding, belittling and insulting her, as well as charging her with being AWOL in December 2015.

To make out a claim of Title VII retaliation, a plaintiff must show that (1) she engaged in a protected activity, (2) she subsequently suffered an adverse employment action, and (3) the two are causally linked. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004). A plaintiff may establish the adverse employment element by showing that the "'workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive working environment.'" Quiles-Quiles v. Henderson, 439 F.3d 1, 7 (1st Cir. 2006) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

Tavares testified that he met with the RAC on a weekly basis to discuss Cahill's case, the record shows that he and Cahill were in contact by phone and email during her leave of absence and, notably, he found her the accommodation that she had requested after she filed the EEO complaint. At bottom, the record fails to suggest that the delay in finding Cahill a reasonable accommodation was due to anything other than the nature of her disabilities. As to Tarsky, Cahill fails to support, her allegations that she was insulted, belittled, or humiliated. Regarding the

---

[3] Cahill's suggestion that her November 25, 2013 email to Edwin Muller was a "complaint," constituting protected conduct with respect to Tavares, is specious. (See Pl. Patricia Cahill's Opp'n to Def.'s Mot. Summ. J. (dkt. no. 103-6).) The email neither raised a complaint nor mentioned Tavares. (See id., Ex. 2 (dkt. no. 103-2).)

December 2015 charge of unauthorized leave, Cahill's declaration does not dispute that she did not have prior authorization for her absence.

### D. Discrete Acts of Retaliation (Count V)

Count V alleges four discrete acts of retaliation: (1) the February 2015 Notice of Proposed 14-Day Suspension, (2) the July 2015 Notice of Proposed 7-Day Suspension, (3) Cahill's "constructive suspension" from work in September 2015, and (4) Cahill's constructive discharge through her application for disability retirement in January 2016.

To the extent that Cahill has not abandoned these claims, they are wholly unsupported by the factual record.

## III. Conclusion

For the reasons stated, the defendant's Motion for Summary Judgment on All Claims (dkt. no. 94) is GRANTED. Judgement shall enter in favor of the defendant.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
Senior United States District Judge